### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

| | |
|---|---|
| Dawn Nelson, | Civil No. 06-4298 (DWF/SRN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Michael J. Astrue, Commissioner of Social Security, | |
| Defendant. | |

---

Jennifer Mrozik, Esq., Northwest Disability Services, 1611 West County Road B, Suite 106, Roseville, Minnesota 55113, for Plaintiff

Lonnie Bryan, Esq., United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Defendant

---

SUSAN RICHARD NELSON, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Dawn Nelson seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits. Both parties have filed motions for summary judgment, and the motions have been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that Plaintiff's motion be denied and Defendant's motion be granted.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff Dawn Nelson filed an application for disability insurance benefits on March 7,

2003.  (Admin. R. at 64-66.)  She alleged a disability onset date of May 22, 2002, due to

fibromyalgia, irritable bowel syndrome, depression, and a sleep disorder.  (Id. at 49, 80.)  The

application was denied initially and upon reconsideration.  (Id. at 34-35, 36-37.)  Plaintiff

requested a hearing before an Administrative Law Judge (ALJ), which was held on December 2,

2004.  (Id. at 49, 666.)  On May 13, 2005, the ALJ issued an unfavorable decision.  (Id. at 16.)

The Appeals Council denied a request for further review on August 30, 2006.  (Id. at 7-9.)  The

denial of review made the ALJ's decision the final decision of the Commissioner.  See 42 U.S.C.

§ 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).

### B.    Factual Background

Plaintiff was forty-four years old at the time of the ALJ's decision.  (Admin. R. at 31.)

She had past work experience as a quality assurance analyst, kitchen helper, and electronics

assembler.  (Id. at 148.)  She most recently worked as a quality assurance analyst for thirty hours

a week.  (Id. at 199.)

Plaintiff testified at the administrative hearing that she could not work due to

fibromyalgia and accidents caused by irritable bowel syndrome.  (Id. at 671.)  She also

experienced pain, tiredness, difficulty with concentration, and anxiety from having fecal

incontinence.  (Id. at 671, 680-81.)  Her incontinence varied from having one accident every two

weeks to having five or six in one day.  (Id. at 681.)  She said she used the bathroom about ten

times a day, each time varying from a few minutes to twenty minutes.  (Id. at 682.)

During the day, Plaintiff passed her time by doing light housework, cooking, watching

television, reading, scrapbooking, and making cards.  (Id. at 672-74.)  She exercised in a warm

water pool.  (Id. at 675.)  She could walk ten to twenty minutes without stopping and stand for

about the same amount of time.  (<u>Id.</u> at 677.)

> ### C.   Medical Evidence in the Record

> #### 1.   Evidence Predating Onset of Disability

Plaintiff first sought treatment for fatigue in March 2001.  (<u>Id.</u> at 174, 176.)  In June 2001, she reported having diarrhea five to ten times a day, but results of a colonoscopy were normal.  (<u>Id.</u> at 172.)  In September 2001, Dr. William Armstrong noted that Plaintiff's bowels were well managed by Cholestyramine and Imodium.  (<u>Id.</u> at 169.)  He concluded that Plaintiff probably had an irritable bowel.  (<u>Id.</u>)  The next month, Plaintiff complained of diarrhea after each meal, pain, and fatigue.  (<u>Id.</u> at 168.)

Plaintiff saw a nurse practitioner, Julie Dahl, in January 2002 for treatment of her pain, fatigue, and diarrhea.  (<u>Id.</u> at 166-67.)  Ms. Dahl noted that Plaintiff was taking an anxiety medication, Ativan, to help with daytime anxiety and sleep at night.  (<u>Id.</u> at 166.)  Upon examination, Plaintiff's strength and range of motion were normal, but she had some tenderness with palpation.  (<u>Id.</u>)

In March 2002, Plaintiff continued to experience pain and fatigue, without relief from Vioxx or chiropractic treatment.  (<u>Id.</u> at 164.)  Ms. Dahl prescribed Ultracet for Plaintiff's pain and referred her to a rheumatologist for a fibromyalgia assessment.  (<u>Id.</u> at 164-65.)  Plaintiff was subsequently evaluated in May 2002 by rheumatologist David Ridley.  (<u>Id.</u> at 160-61.)  Dr. Ridley commented that Plaintiff had a long history of anxiety, depression, and pain in her low back, neck, and multiple other areas.  (<u>Id.</u> at 160.)  Her examination was within the normal limits for range of motion, but a trigger point exam showed trigger points in twenty of twenty expected sites.  (<u>Id.</u> at 161.)  Dr. Ridley concluded, "[t]he patient has classic symptoms of fibromyalgia."

(Id.)  He prescribed Trazodone to help Plaintiff sleep and recommended the fibromyalgia clinic at Abbott Northwestern Hospital.  (Id.)

### 2.    Medical Records Between the Onset Date and the ALJ's Decision

Plaintiff began treatment at the Sister Kenny Institute at Abbott Northwestern Hospital in June 2002, reporting symptoms of pain, unrefreshing sleep, and diarrhea.  (Id. at 399.)  Upon examination by a nurse, Plaintiff exhibited thirteen of eighteen tender points.  (Id. at 402.)  The nurse recommended physical therapy and a high fiber diet.  (Id. at 399.)

Also in June 2002, Plaintiff saw Dr. Anthony Berliner at Allina Medical Clinic.  (Id. at 200.)  Dr. Berliner noted that Plaintiff struggled with many symptoms, including an irritable bowel and fibromyalgia.  (Id.)  Based on the lack of any blood test, x-ray, or biopsy, he opined that no objective findings supported a formal diagnosis of irritable bowel syndrome.  (Id.)  Later that month, Dr. Jyothsna Rayadurg examined Plaintiff and remarked that she had a full range of motion, a stiff neck and shoulders, and multiple soft tissue tender points.  (Id. at 198.)  He assessed a "clinical picture of fibromyalgia" and recommended twenty-four hour pain medication, physical therapy, and water classes at the YMCA.  (Id.)  Dr. Rayadurg told Plaintiff that he would extend her leave from work for four more weeks, but that most of his patients with fibromyalgia worked at least twenty hours a week.  (Id.)

Dr. Rayadurg saw Plaintiff again on July 15, 2002.  (Id. at 197.)  Plaintiff had developed a rash and her irritable bowel symptoms had worsened.  (Id.)  Dr. Rayadurg changed Plaintiff's medications and noted that, if Neurontin or Darvocet did not work, Plaintiff should go to a pain clinic for pain management.  (Id.)  Dr. Rayadurg extended Plaintiff's work leave but suggested that she return to work twenty hours a week.  (Id.)  Plaintiff asked about working two ten-hour

4

days instead.  (Id.)  Dr. Rayadurg noted that Plaintiff's irritable bowel symptoms discouraged her

from working four hours, five days a week, which was more appropriate for fibromyalgia

patients.

Two weeks later, Plaintiff told Dr. Rayadurg that she did not feel she could return to

work the following week.  (Id. at 195.)  Dr. Rayadurg extended Plaintiff's work leave eight more

weeks to allow for adjustments in Plaintiff's medications, but he noted, "I have explained to her

that at some point in time[,] she will definitely go back to work at least 20 hours per week.  I do

not put people on complete disability for fibromyalgia."  (Id.)

The following month, Plaintiff reported sleeping poorly, but her irritable bowel

symptoms had improved after she began taking Amitriptyline.  (Id. at 194.)  Plaintiff still did not

believe she was ready to return to work.  (Id.)  Dr. Rayadurg adjusted Plaintiff's medications and

extended her work leave until September 23, 2002.  (Id.)

Plaintiff was evaluated by a second rheumatologist, Dr. Ronald Messner, on September

4, 2002.  (Id. at 337-38.)  Upon examination, Plaintiff exhibited a full range of motion, but

eighteen of eighteen tender points were positive for fibromyalgia.  (Id.)  Dr. Messner opined that

Plaintiff "fits the diagnosis of fibromyalgia . . . [and] has significant anxiety and anger over her

condition."  (Id. at 338.)  He encouraged a more active exercise program and more aggressive

help for anger and anxiety.  (Id.)

Rather than return to Dr. Rayadurg, Plaintiff began treatment of her fibromyalgia at

North Suburban Family Physicians on September 23, 2002.  (Id. at 244.)  At that time, Plaintiff

was taking Ultracet and Flexeril for pain and Ativan for anxiety.  (Id. at 244-45.)  Examination

revealed a "pleasant female in no acute distress."  (Id. at 245.)  The physician also noted that

Plaintiff was overweight at 208 pounds and reviewed her diet with her.  (Id.)

On October 15, 2002, Plaintiff saw Dr. David Nelson at the Medical Pain Clinic for treatment of her low back pain, which she rated as an eight on a ten-point scale.  (Id. at 202.) She reported sleeping poorly, but she was in a good mood.  (Id.)  Dr. Nelson described her as well-groomed, alert, oriented, capable of a full range of motion, pain with flexion, and good strength and reflexes.  (Id.)  Dr. Nelson recommended trigger point injections and physical therapy.  (Id. at 203.)

Plaintiff saw a nurse, C. Bulger, for fibromyalgia treatment on October 23, 2002.  (Id. at 242.)  Plaintiff said that her pain and mood had improved but she was sleeping poorly.  (Id.) Because Plaintiff's insurance did not cover her current anti-depressant medicine, she was switched to Celexa.  (Id. at 243.)  About a month later, Plaintiff told Ms. Bulger that she was very frustrated with her failure to improve.  (Id. at 240.)  Ms. Bulger noted that Plaintiff's occupational therapist and nurse practitioner felt she could not return to work until her sleep improved.  (Id.)  Plaintiff's weight had increased to 218 pounds, and Ms. Bulger discussed ways to improve Plaintiff's diet.  (Id. at 241.)  Ms. Bulger wrote that Plaintiff's goal was to resume working part-time in a month.  (Id.)

Plaintiff sought treatment for her sleeping problems at the Minnesota Sleep Institute on December 9, 2002.  (Id. at 210.)  Dr. Joan Fox noted that Plaintiff was obese and appeared tired and fatigued.  (Id.)  Dr. Fox recommended a sleep study and a trial of Ambien.  (Id. at 211.)

Plaintiff began seeing Dr. Karen Mackenzie on December 31, 2002.  (Id. at 236.)  Dr. Mackenzie noted: "What she is really here for today is to establish a visit here because she needs a claim of disability in order to access employment counseling."  (Id. at 236-37.)

Dr. Fox conducted a sleep study with Plaintiff on January 3, 2003.  (Id. at 208.)
Although Plaintiff slept for only 137 minutes, the study indicated "very mild" obstructive sleep
apnea.  (Id.)  Dr. Fox could not determine whether the arousals were due to chronic pain or
snoring, and she recommended a CPAP trial to further assess the extent of sleep apnea.  (Id.)  Dr.
Fox was able to conclude that Plaintiff had "very poor sleep efficiency," and she prescribed an
increased dosage of Neurontin before bedtime to alleviate pain.  (Id.)

Plaintiff saw Dr. Mackenzie again on February 4, 2003, following the sleep study.  (Id. at
235.)  Plaintiff reported an exacerbation of her irritable bowel symptoms, which Dr. Mackenzie
attributed to the increased dosage of Neurontin.  (Id.)  Dr. Mackenzie suggested that Plaintiff
stop taking Neurontin, and then restart the medication with gradual increases in dosage.  (Id.)

Plaintiff returned to the Minnesota Sleep Institute in March 2003.  (Id. at 207.)  She
reported feeling frustrated because she no longer felt rested after sleeping four hours, which
previously was all that she had required.  (Id.)  Dr. Fox suggested repeating the sleep study and
trying some new medicine.  (Id.)

In April 2003, Plaintiff underwent a psychological consultative exam for depression and
anxiety with Dr. Donald Wiger.  (Id. at 224.)  Dr. Wiger noted that Plaintiff's level of depression
varied and that she took Ativan for anxiety.  (Id. at 224-25.)  Upon review of Plaintiff's daily
activities, Dr. Wiger noted that she cooked for others, got herself ready in the mornings, did
stretching exercises, picked up around the house, performed various chores, read, and watched
television.  (Id. at 225.)  However, Plaintiff did not drive, vacuum, or clean certain areas of her
house.  (Id.)  Dr. Wiger observed that Plaintiff "appeared to be in good health."  (Id.)  Plaintiff
was cooperative and attentive, and her affect was normal.  (Id. at 226.)  She did not appear

anxious or depressed, and Dr. Wiger stated that "she clearly does not describe major depression." (Id.) She also did not describe symptoms indicative of an anxiety disorder. (Id.) Her attention, concentration, memory, and judgment were all good. (Id.) Dr. Wiger diagnosed an adjustment disorder with mild depression, no anxiety disorder, and features of pain disorder due to fibromyalgia. (Id. at 227.) He assessed a GAF score of 60. (Id.) Dr. Wiger concluded that Plaintiff could understand directions, carry out mental tasks with reasonable persistence and pace, respond appropriately to coworkers, and handle the mental stressors of the workplace. (Id.)

On April 23, 2003, Plaintiff told Dr. Mackenzie that she was taking Flexeril before bedtime and that she was sleeping better. (Id. at 232.) Plaintiff asked about taking a pain medication other than Extra Strength Tylenol, which Dr. Mackenzie discouraged because ansaid-based medication had caused irritable bowel symptoms in the past. (Id.) Plaintiff had no complaints of irritable bowel symptoms at this visit, however. (Id.) Finally, Dr. Mackenzie noted that Plaintiff had applied for disability insurance benefits and that Plaintiff's finances were tight. (Id.)

Plaintiff saw Dr. Armstrong at the Sister Kenny Institute on June 4, 2003. (Id. at 249.) She reported that her biggest problems were an irritable bowel and non-restorative sleep. (Id.) She felt that her incontinence had improved in the past year, but she continued to have accidents in public, which limited her social events. (Id.) Plaintiff described her pain as a seven or eight on a ten-point scale. (Id.) Dr. Armstrong noted that Plaintiff was "in no acute distress." (Id.) He continued her on Ativan, Cyclobenzaprine, Lexapro, Lopressor, Cholestyramine, and Imodium A-D. (Id.)

Plaintiff underwent another sleep study on July 25, 2003.  (Id. at 284.)  Dr. Fox diagnosed her with mild obstructive sleep apnea and recommended a followup in a sleep disorder clinic.  (Id.)  The next month, Plaintiff told Dr. Mackenzie that her sleep had somewhat improved but was not completely normal.  (Id. at 379.)

Plaintiff returned to Dr. Nelson on September 23, 2003, complaining of pain throughout her body.  (Id. at 204.)  Plaintiff told Dr. Nelson that her pain was usually a six or seven on a ten-point scale, but ranged from a four to a nine.  (Id.)  Upon examination, Dr. Nelson noted that Plaintiff was well-groomed, alert, and awake without drowsiness, but with a slightly anxious affect and "overt painful behavior" during the examination.  (Id. at 206.)  Dr. Nelson concluded that Plaintiff had persistent, multi-level pain.  (Id.)  He recommended physical therapy, pool therapy, and an MRI of her lumbar spine.  (Id.)

On September 29, 2003, Plaintiff saw Dr. Mackenzie for fibromyalgia, irritable bowel symptoms, and sleep disorder.  (Id. at 378.)  She also brought some Social Security disability forms for Dr. Mackenzie to complete.  (Id.)  Plaintiff told Dr. Mackenzie that she was having one accident a week and was considering a colostomy.  (Id.)  Dr. Mackenzie noted that Plaintiff had not seen a gastroenterologist in a year, and she asked Plaintiff to gather her records regarding her previous bowel testing and evaluation.  (Id.)

In October 2003, Plaintiff attended an appointment with Ms. Bulger following a blood sugar laboratory test indicating diabetes.  (Id. at 375.)  After hearing that Plaintiff ate many sweets and dined out almost every night, Ms. Bulger recommended that Plaintiff read the South Beach Diet book, but Plaintiff responded that she did not feel she could change her diet.  (Id.)  Ms. Bulger prescribed Glucophage to help lower Plaintiff's blood sugar level and noted that

9

Plaintiff would begin monitoring her blood sugar levels at home.  (Id.)

During a diabetes re-check appointment in November 2003, Plaintiff reported improved sleep with Flexeril and Extra Strength Tylenol.  (Id. at 373.)  She was fearful to exercise, however, because of her fibromyalgia.  (Id.)  Dr. Mackenzie remarked that Plaintiff's blood sugar levels had improved.  (Id.)  Dr. Mackenzie also recommended a psychiatric consultation to rule out the possibility that a psychological illness was affecting Plaintiff's sleep. (Id.)

In January 2004, Dr. Mackenzie noted that Plaintiff's blood sugar levels had significantly improved.  (Id. at 372.)  Plaintiff told Dr. Mackenzie that her sleep was also improving since she had been taking an increased dosage of Flexeril.  (Id.)  In addition, although the Glucophage had initially caused a gastrointestinal disturbance, it "had really been relieved" by lowering the dosage.  (Id.)

Pursuant to Dr. Fox's referral, Dr. Deborah Coen performed a psychiatric evaluation of Plaintiff on March 9, 2004.  (Id. at 429.)  Plaintiff told Dr. Coen that she sometimes felt sad and anxious and had poor energy, concentration, and memory.  (Id.)  Dr. Coen found Plaintiff to be pleasant and cooperative, with adequate grooming, normal speech, and an appropriate affect. (Id. at 427.)  Although Dr. Coen did not perform any testing, she concluded that Plaintiff's insight, judgment, attention, concentration, memory, and orientation were adequate.  (Id.)  She diagnosed major depressive disorder and recurrent anxiety disorder and assigned Plaintiff a GAF score of 55-60.  (Id.)

In June 2004, Plaintiff saw Dr. Mackenzie for her diabetes, pain, and irritable bowel.  (Id. at 370.)  Plaintiff did not want trigger point injections to treat her pain, so Dr. Mackenzie referred her to the United Pain Clinic and prescribed Vicodin, noting that any pain medications

should be managed by the pain clinic. (Id.) At her next visit with Dr. Mackenzie in July 2004, Plaintiff reported significant problems with diarrhea and irritable bowel symptoms, but said she was on a waiting list for biofeedback treatment with a gastroenterologist. (Id. at 368.) In April 2004, Dr. Mackenzie noted that Plaintiff's intestinal side effects from her medications were "still a little bit iffy," but that Plaintiff was able to tolerate them. (Id. at 371.) Plaintiff told Dr. Mackenzie that she was swimming twice a week, and Dr. Mackenzie recommended that she increase this exercise. (Id.)

Plaintiff attended a counseling session with Dr. Victoria Bouen on September 9, 2004. (Id. at 314.) Her concentration was adversely affected by depression and anxiety, but Dr. Bouen thought most of Plaintiff's symptoms were merely mild or moderate. (Id.) Dr. Bouen discontinued Plaintiff's Lexapro prescription and gave Plaintiff samples of Cymbalta and Ativan. (Id.) The next month, Plaintiff was "doing better – not breaking out in tears." (Id. at 311.) Plaintiff also reported no problems with sleep. (Id.) Dr. Bouen rated all of Plaintiff's symptoms as mild and described Plaintiff as calm, neat, and clean. (Id.)

Plaintiff attended a biofeedback session at the Colon and Rectal Clinic on September 9, 2004. (Id. at 320.) She reported that she experienced fecal incontinence once a week and had two to six bowel movements a day. (Id.) By the next week, Plaintiff's incontinence had improved with the addition of fiber to her diet, but deteriorated again the following week. (Id. at 322.) The next month, Plaintiff saw Dr. Susan Parker at the Colon and Rectal Clinic. (Id. at 317.) At that time, Plaintiff was taking fiber, Imodium, and Lomotil for her irritable bowel and incontinence. (Id.) Dr. Parker did not consider Plaintiff a good candidate for sacral nerve stimulation, and they discussed an artificial bowel sphincter or a colostomy. (Id.) Dr. Parker

told Plaintiff to keep a diary so that she could determine Plaintiff's best treatment option.  (Id.)

Plaintiff attended an appointment with Dr. Mackenzie on October 21, 2004, to discuss her diabetes.  (Id. at 365.)  Although Plaintiff said she was frustrated with her evaluation at the pain clinic, Dr. Mackenzie did not note any complaints of pain, nor did she record any complaints of diarrhea or incontinence.  (Id.)  Dr. Mackenzie only counseled Plaintiff on her diabetes and treated some lesions on Plaintiff's face and body.  (Id.)

On November 11, 2004, Dr. Mackenzie completed a Medical Assessment of Ability To Do Work-Related Activities (Physical) form, on which she opined that Plaintiff could lift five to ten pounds occasionally, stand for two hours in a workday, walk for twenty minutes without interruption, sit for six hours in a workday, and sit for twenty minutes at a time.  (Id. at 326-27.) Dr. Mackenzie also opined that Plaintiff could not climb, balance, stoop, crouch, kneel, or crawl. (Id. at 328.)  In addition, she restricted Plaintiff to no repetitive reaching, no pushing or pulling, no moving machinery, no temperature extremes, and no repetitive keyboarding.  (Id. at 328-29.) Dr. Mackenzie noted that her findings were based on a diagnosis of fibromyalgia with medical findings from a trigger point examination.  (Id. at 328, 329.)

Dr. Mackenzie also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form.  (Id. at 330.)  With respect to Plaintiff's ability to make occupational adjustments, Dr. Mackenzie rated Plaintiff's ability to deal with the public as fair, her ability to interact with supervisors as good, and her ability to use judgment, relate to co-workers, and follow work rules as very good.  (Id.)  She assessed Plaintiff's ability to deal with work stresses as only fair, due to Plaintiff's pain and insomnia.  (Id. at 331.)  She rated Plaintiff's ability to maintain attention and concentration as good.  (Id.)  She rated Plaintiff's abilities to make

performance adjustments and personal-social adjustments as good to very good.  (Id. at 331-32.)

Finally, she described Plaintiff's ability to relate predictably in social situations as fair. (Id. at

332.)

Dr. Mackenzie also completed a Fibromyalgia Questionnaire for Plaintiff.  (Id. at 333.)

She identified thirteen specific tender points on Plaintiff's body.  (Id.)  In addition to

fibromyalgia, Dr. Mackenzie wrote that Plaintiff suffers from fatigue, numbness and tingling in

her hands and feet, irritable bowel syndrome, dizziness, sleep disturbance, joint pain, headaches,

cold sensitivity, gastrointestinal problems, concentration and memory problems, and swelling of

the hands and feet.  (Id. at 334.)  Dr. Mackenzie thought that Plaintiff's impairments would cause

her to take frequent, unscheduled fifteen-minute breaks in a work setting.  (Id. at 335.)  She

opined that Plaintiff would miss fifteen days of work a month as a result of her impairments.  (Id.

at 336.)  However, she also indicated that she believed Plaintiff would be capable of working in

a low stress job.  (Id.)

On September 15, 2004, Dr. John Hansen evaluated Plaintiff at the United Pain Center,

pursuant to a referral from Dr. Mackenzie.  (Id. at 348.)  Plaintiff described her pain as a seven

on a ten-point scale.  (Id. at 350.)  Dr. Hansen found that Plaintiff had excellent cognitive

function but was dysthymic in affect, as well as obese.  (Id.)  He noted tenderness to palpation

but an excellent range of motion in her neck and shoulders.  (Id.)  Dr. Hanson's assessment was

chronic low back pain, chronic myofascial syndrome in her right shoulder and arm, irritable

bowel syndrome, incontinence, eclampsia, and psychodynamic issues.  (Id.)  However, Dr.

Hanson did "not see the need to invoke the name fibromyalgia for her problems . . . .

Noteworthy about her story is the lack of resilience that the patient has in dealing with these to

13

the point that they have all combined to be overwhelming for her.  This speaks of some underlying psychologic[al] issues that prevent her from being resilient, and which interact adversely with her physical medicine problems to lead to the current state." (<u>Id.</u>)  He recommended physical therapy, psychotherapy, continued biofeedback, and no changes in medication.  (<u>Id.</u> at 351.)

Plaintiff's psychologist, Jacky Baker, submitted an opinion to the Social Security Administration on Plaintiff's behalf on November 16, 2004.  (<u>Id.</u> at 394.)  Ms. Baker stated that Plaintiff was depressed and taking medication for her depression.  (<u>Id.</u>)  She further stated, "I believe that her depression would be greatly alleviated if she were employed.  However, it appears that is not likely to happen without some drastic improvement in her physical condition." (<u>Id.</u>)

On November 12, 2004, Plaintiff was evaluated by Dr. Todd Hess at the United Pain Center.  (<u>Id.</u> at 559.)  Upon examination, Plaintiff exhibited sixteen of eighteen tender points typical of fibromyalgia.  (<u>Id.</u> at 560.)  Dr. Hess assessed an ongoing history of pain which met the criteria for fibromyalgia; significant anxiety, depression, and sleep deprivation from pain; irritable bowel syndrome with fecal incontinence; a history of eclampsia; and diabetes.  (<u>Id.</u> at 561.)  He recommended that Plaintiff continue with the pool therapy and weight reduction.  (<u>Id.</u> at 561.)  Dr. Hess thought that Plaintiff's impairments would qualify her for disability insurance benefits, but only on a temporary basis. (<u>Id.</u> at 562.)

On December 2, 2004, Dr. Bouen noted that Cymbalta was improving Plaintiff's irritable bowel symptoms and that Plaintiff was sleeping better.  (<u>Id.</u> at 574.)  In February 2005, Plaintiff told Dr. Bouen that she was discouraged about her disability claim and that she was stressed

about finances.  (Id.)

Plaintiff attended a follow-up appointment with Dr. Hess on April 2, 2005.  (Id. at 557.)
She told Dr. Hess that she was very frustrated because her disability proceedings were not going
favorably and her family was suffering financially.  (Id.)  As for her health, she reported that her
irritable bowel symptoms had improved but that she continued to have pain and significant
fatigue.  (Id.)  Dr. Hess noted that her pain met the criteria for fibromyalgia and possibly lupus or
another connective tissue disorder.  (Id.)  He recommended increasing her dosage of Flexeril, but
if that did not work, starting her on a low dose of methadone.  (Id. at 558.)

On April 4, 2005, Dr. Bouen noted that Plaintiff's mood was a little better and her
irritable bowel symptoms were improved.  (Id. at 572.)

### 3.      Medical Evidence Submitted to the Appeals Council After the ALJ's Decision

Apparently by June 9, 2005, Plaintiff was taking methadone for her pain.  She told nurse
Deborah Hauser that the methadone was effective in treating her pain, but she still rated her pain
as an eight on a ten-point scale.  (Id. at 549, 551.)

A week later, on June 16, 2005, Plaintiff told Dr. Bouen that she was severely depressed
and hopeless.  (Id. at 438.)  Plaintiff was referred to United Hospital where she was admitted
with "reactive depression."  (Id. at 441.)  Dr. Scott Yarosh evaluated Plaintiff and noted that she
was "embroiled in a controversy regarding her disability benefits" which caused her to spiral
"down into the throes of a more significant depressive episode."  (Id. at 441.)  Dr. Yarosh
diagnosed severe major depression and thought Plaintiff was a good candidate for partial
hospitalization.  (Id. at 443.)

15

Plaintiff saw Dr. Hess at the United Pain Center on July 19, 2005.  (Id. at 547.)  Plaintiff said that her symptoms had not improved at all.  (Id.)  Plaintiff also expressed frustration with the adverse decision on her claim for disability insurance benefits.  (Id.)  Dr. Hess assessed an ongoing history of fibromyalgia with continued symptoms, possible connective tissue disorder, anxiety, depression, sleep deprivation, sacroiliac joint asymmetry, irritable bowel syndrome, and diabetes.  (Id. at 548.)  He noted that lupus had been ruled out.  (Id.)

Plaintiff attended therapy with Ms. Baker on July 26, 2005.  (Id. at 434.)  Ms. Baker noted that Plaintiff was feeling suicidal and that the recurring issue was the denial of her disability claim.  (Id.)  Plaintiff brought the ALJ's decision with her to the appointment and read it to Ms. Baker.  (Id.)  Ms. Baker advised Plaintiff to try and understand the realities of the Social Security system and not to take the ruling personally.  (Id.)  On August 4, 2005, Dr. Bouen wrote that Plaintiff was doing better, although her affect was constrained and her mood was dysphoric. (Id. at 432.)

On September 12, 2005, Plaintiff saw Ms. Hauser and described her pain as an eight or nine on a ten-point scale.  (Id. at 544.)  She reported that Cymbalta was helping her irritable bowel symptoms, that her mood was better, that she was no longer suicidal.  (Id.)  Upon examination, she was well-groomed, alert, oriented, and articulate, but deconditioned and overweight in appearance.  (Id. at 545.)  She could stand and walk without difficulty.  (Id.)  Ms. Hauser started Plaintiff on a trial of Pregabalin for her pain.  (Id.)

On October 12, 2005, Plaintiff saw Dr. Hess for pain and profuse diarrhea, which she felt was caused by the Pregabalin, although Dr. Hess was unaware of that particular side effect.  (Id. at 541.)  Dr. Hess wrote that Plaintiff was "not healthy at all today.  She is not doing well."  (Id.)

Plaintiff said that she had terrible pain all over her body.  (<u>Id.</u>)  Dr. Hess characterized Plaintiff's

situation as "distressing and depressing" and "a very unfortunate case."  (<u>Id.</u> at 542.)  He thought

that the United Pain Center had not been able to improve Plaintiff's health, and he was at a loss

for new treatment ideas.  (<u>Id.</u> at 542-53.)

At a December 2005 counseling appointment, Plaintiff's symptoms of depression ranged

from mild to moderate, and her anxiety had returned.  (<u>Id.</u> at 607.)

Plaintiff saw Dr. Jeanette Keifert in February 2006 for shortness of breath and swollen

legs.  (<u>Id.</u> at 614.)  Her blood sugar levels were good.  (<u>Id.</u>)  Dr. Keifert noted that Plaintiff had

not been as active as advised.  (<u>Id.</u>)  She recommended that Plaintiff increase her activity, elevate

her feet, and decrease her salt intake.  (<u>Id.</u> at 615.)

On March 7, 2006, Dr. Bouen completed a Medical Assessment of Ability To Do Work-

Related Activities (Mental) form.  (<u>Id.</u> at 604-06.)  She opined that Plaintiff had a fair ability to

follow work rules, relate to coworkers, deal with the public, use judgment, interact with

supervisors, deal with work stresses, function independently, maintain attention and

concentration, and understand, remember, and carry out simple job instructions.  (<u>Id.</u> at 604-05.)

She thought Plaintiff had no ability to understand, remember, and carry out complex or detailed

job instructions.  (<u>Id.</u> at 605.)  Dr. Bouen noted that Plaintiff's chronic pain significantly affected

her depression and motivation.  (<u>Id.</u>)

### D.    Evidence from the Medical Expert

A medical expert, Dr. Andrew Steiner, testified at the administrative hearing.  (<u>Id.</u> at 682-

86.)  Dr. Steiner noted that Plaintiff's diagnoses were an adjustment disorder with mild

depression, obesity, mild obstructive sleep apnea, fibromyalgia, pain, and irritable bowel

syndrome with fecal incontinence.  (Id. at 682-83.)  He did not believe that the impairments met

or equaled a listed impairment.  (Id. at 683.)  In evaluating Plaintiff's residual functional capacity

(RFC), Dr. Steiner found that Plaintiff had restrictions in lifting and standing, and that she would

require an accommodation permitting her to use the bathroom.  (Id. at 683-84.)  Dr. Steiner noted

that Plaintiff's fecal incontinence varied in intensity and frequency and increased with stress.

Dr. Steiner did not agree with Dr. Mackenzie's opinion that Plaintiff would need unscheduled

breaks to accommodate the pain caused by fibromyalgia.  (Id. at 684-85.)

### E.    Evidence from the Vocational Expert

A vocational expert, Norman Mastbaum, also testified at the hearing.  (Id. at 686.)  The

ALJ asked Mr. Mastbaum to consider a person limited to light, unskilled work who needs ready

access to a bathroom.  (Id.)  Mr. Mastbaum opined that such a person could return to Plaintiff's

past relevant work, as long as she did not need to take unscheduled bathroom breaks.  (Id. at

686-87.)  A person who would need to take unscheduled bathroom breaks could not perform

Plaintiff's past work.  (Id. at 687.)

The ALJ then asked Mr. Mastbaum to consider a forty-three year-old person with more

than a high school education; with the past relevant work of quality assurance analyst, kitchen

helper, and electronics assembler; with impairments of sleep apnea, irritable bowel syndrome,

fibromyalgia, and adjustment disorder; limited to not lifting or carrying more than twenty

pounds; able to stand or walk six hours in an eight-hour workday, and sit for six hours in an

eight-hour workday; requiring ready access to a bathroom; and limited to simple, unskilled work

because of an adjustment disorder.  (Id. at 688.)  Mr. Mastbaum opined that the hypothetical

person could work as an office helper, room service clerk, or checker, but that no more than two

days a month of absenteeism would be permitted in those jobs.  (Id. at 699-89.)

Plaintiff's attorney then asked Mr. Mastbaum whether a person who required frequent, unscheduled breaks of up to twenty minutes, whether due to fibromyalgia or incontinence, could perform those jobs.  (Id. at 689.)  Mr. Mastbaum testified that such a requirement would preclude competitive employment.  (Id.)

**F.     The ALJ's Decision**

In his decision, the ALJ employed the required five-step sequential evaluation:
(1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether the claimant is capable of returning to past work; and (5) whether the claimant can do other work existing in significant numbers in the regional or national economy.  See 20 C.F.R. § 404.1520(a)-(f).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the onset date of May 22, 2002.  (Admin. R. at 21.)  At step two, the ALJ found that Plaintiff had severe impairments of fibromyalgia, irritable bowel syndrome, obesity, and sleep apnea.  (Id.)  Acknowledging that Plaintiff also suffered from repetitive stress injury, diabetes, depression, adjustment disorder, and anxiety, the ALJ determined that those impairments were not severe because they did not exist at medically determinable levels for at least twelve months during the relevant time period.  (Id. at 22.)  At the third step, the ALJ relied primarily on Dr. Steiner's opinion to conclude that none of Plaintiff's impairments or combination of impairments met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Id. at 25.)  The ALJ noted that there was no direct listing for fibromyalgia or obesity, and that the listing for

irritable bowel syndrome required evidence of obstruction or weight loss, which Plaintiff did not

have.  (Id.)  Likewise, the evidence pertaining to Plaintiff's sleep apnea did not support a listing

for lung function.  (Id.)

> Turning to step four, the ALJ found that Plaintiff had the following RFC:
>
> light work, defined as work lifting 20 pounds occasionally and frequent lifting or
> carrying of objects weighing 10 pounds, standing and/or walking 6 or 8 hours, or
> sitting most of the time with some pushing and pulling arm or leg controls, but
> that is unskilled and allows for ready access to bathroom facilities.

(Id.)  In formulating this RFC, the ALJ found Plaintiff's subjective complaints "to be less than

credible."  (Id. at 25.)  Further, the ALJ gave "great weight" to Dr. Steiner's opinion that

Plaintiff was limited to light work and required some allowance for access to the bathroom.  (Id.

at 26.)  The ALJ also described the objective medical evidence at length and explained how it

did not support the allegedly disabling conditions.  (Id. at 26-30.)  Notably, the ALJ expressly

rejected the specific limitations suggested by Dr. Mackenzie on November 11, 2004, finding that

the limitations were not supported by any objective findings and were inconsistent with other

substantial evidence.  (Id. at 29.)  The ALJ noted that the restrictions were based solely on

Plaintiff's subjective complaints, and that Dr. Mackenzie did not personally perform any

objective testing of Plaintiff's irritable bowel symptoms, sleep apnea, or fibromyalgia.  (Id.)

Rather, as the ALJ explained, Dr. Mackenzie referred Plaintiff to other physicians for testing and

treatment of those conditions.  (Id.)

Next, at the fourth step, the ALJ determined that Plaintiff could not perform her past

relevant work as a quality assurance analyst, kitchen helper, or electronics assembler.  (Id. at 30.)

However, at the final step, the ALJ concluded that Plaintiff could perform other work existing in

significant numbers in the national economy such as office helper, room service clerk, and

checker.  (Id. at 31.)

## II.    STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability benefits may

be awarded.  "The Social Security program provides benefits to people who are aged, blind, or

who suffer from a physical or mental disability."  Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir.

1992).  "Disability" under the Social Security Act is the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment."  42

U.S.C. § 423(d)(1)(A).  The claimant's impairments must be "of such severity that he is not only

unable to do his previous work but cannot, considering his age, education, and work experience,

engage in any other kind of substantial gainful work which exists in the national economy."  Id.

§ 423(d)(2)(A).  The impairment must have lasted or be expected to last for a continuous period

of at least twelve months, or be expected to result in death.  Id. § 423(d)(1)(A).

### A.    Administrative Review

If a claimant's initial application for benefits is denied, he or she may request

reconsideration of the decision.  20 C.F.R. § 404.909(a)(1).  A claimant who is dissatisfied with

the reconsidered decision may obtain administrative review by an ALJ.  Id. § 404.929.  If the

claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals

Council, although review is not automatic.  Id. §§ 404.967-.982.  The decision of the Appeals

Council, or of the ALJ if the request for review is denied, is final and binding upon the claimant

unless the matter is appealed to a federal district court within sixty days after notice of the

Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.981.

**B.     Judicial Review**

Judicial review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence in the record as a whole.  Hutsell v. Sullivan, 892 F.2d 747, 748-49 (8th Cir. 1989).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  The review is "more than a mere search of the record for evidence supporting the [Commissioner's] finding."  Brand v. Sec'y of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).  Rather, "'the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'"  Id. (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

The reviewing court must review the record and consider:

1.     The credibility findings made by the ALJ.
2.     The plaintiff's vocational factors.
3.     The medical evidence from treating and consulting physicians.
4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
5.     Any corroboration by third parties of the plaintiff's impairments.
6.     The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989) (citing Brand, 623 F.2d at 527).  A court may not reverse the Commissioner's decision simply because substantial evidence would support an opposite conclusion, Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984), and in reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact, Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Instead, the court must

22

consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987). If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's decision, the court must affirm that decision. Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).

## III.    DISCUSSION

Plaintiff contends that the Commissioner's decision is erroneous in four respects: (1) the ALJ failed to give proper weight to Dr. Mackenzie's opinion regarding Plaintiff's limitations and improperly substituted his own lay opinion; (2) Plaintiff's depression and anxiety were severe impairments; (3) the ALJ improperly evaluated Plaintiff's credibility; and (4) the ALJ did not include all of Plaintiff's limitations in the hypothetical question posed to the vocational expert. Defendant contests each of Plaintiff's arguments.

### A.    The Medical Opinions on Plaintiff's Functional Restrictions

Plaintiff asserts that the ALJ did not rely on any physician's medical opinion but substituted his own lay opinion as to Plaintiff's RFC. Plaintiff also contends that the ALJ should have adopted Dr. Mackenzie's opinion about Plaintiff's functional limitations.

Contrary to Plaintiff's position, the ALJ did not substitute his own lay opinion for the opinion of Plaintiff's treating physician. He expressly relied on the opinion of the medical expert, Dr. Steiner. The actual issue is therefore whether the ALJ erred in crediting Dr. Steiner's opinion over that of Dr. Mackenzie. In addition, the ALJ did not expressly reject all of Dr. Mackenzie's opinions, only her opinion of November 11, 2004, in which she indicated that Plaintiff was restricted in activities such as lifting, standing, walking, and sitting.

In evaluating a medical opinion, an ALJ must consider the following factors: (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).  The same factors apply to opinions of a testifying medical expert.  Id. § 404.1527(f)(2)(iii).  A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in [the] record."  Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).  The ALJ may credit other medical opinions over that of a treating physician when such opinions are supported by better evidence or the treating physician has rendered inconsistent opinions.  Id. at 1013 (citations omitted).

## 1. Dr. Mackenzie's Opinion of November 11, 2004

"Fibromyalgia is muscle pain in fibrous tissues . . . which results in symptoms such as achiness, stiffness, and chronic joint pain."  Kelley v. Callahan, 133 F.3d 583, 585 n.2 (8th Cir. 1998) (citations omitted).  There is no question that Plaintiff has fibromyalgia, and indeed, the ALJ found that fibromyalgia was one of Plaintiff's severe impairments.  However, because fibromyalgia is not listed as an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ was required to determine whether the symptoms of Plaintiff's fibromyalgia were disabling.

In assessing how Plaintiff's impairments, including her fibromyalgia symptoms, affected her RFC, the ALJ discounted Dr. Mackenzie's opinion on Plaintiff's limitations because he found that the opinion was not supported by objective findings and was inconsistent with other

substantial evidence.  (Admin. R. at 29.)  He noted that Dr. Mackenzie referred Plaintiff to other

providers for assessment of her fibromyalgia, irritable bowel syndrome, sleep apnea, and pain.

(Id.)  The ALJ also remarked that Dr. Mackenzie did not personally test Plaintiff's strength,

movement, ability to sit, ability to stand, ability to walk, or ability to lift.  (Id.)  According to the

ALJ, the limitations suggested by Dr. Mackenzie were not based on any objective, clinical

findings made by her, and were not even supported by the objective, clinical findings made by

others.  (Id.)

Dr. Mackenzie clearly had a long-term treatment relationship with Plaintiff, but it is true

that she almost always referred Plaintiff to other doctors for evaluation of specific conditions.

For example, Dr. Mackenzie referred Plaintiff to Dr. Fox for assessment and treatment of sleep-

related issues, to Dr. Hanson for assessment and treatment of fibromyalgia and pain, and to Dr.

Parker for assessment and treatment of gastrointestinal problems.  There is no evidence of an

actual trigger point examination conducted by Dr. Mackenzie, and she never tested Plaintiff's

ability to lift, sit, stand, walk, climb, balance, stoop, crouch, or kneel.  On the other hand, Drs.

Ridley, Rayadurg, Messner, and Hess did perform trigger point evaluations, but none of them

opined or even suggested that Plaintiff would be limited to the extent opined by Dr. Mackenzie.

Thus, the ALJ did not err in finding that Dr. Mackenzie's opinion on Plaintiff's functional

limitations was not supported by objective clinical testing or findings and was inconsistent with

the record as a whole.

Dr. Mackenzie's own treatment notes are also inconsistent with her opinion.  "When a

treating physician's notes are inconsistent with his or her residual functional capacity

assessment, we decline to give controlling weight to the residual functional capacity

assessment." Pirtle v. Astrue, 479 F.3d 931, 933 (8th Cir. 2007).  Dr. Mackenzie's records

frequently indicate that Plaintiff was in no acute distress and that Plaintiff's sleep and irritable

bowel symptoms were improving.  There is no evidence that Dr. Mackenzie suggested seeking

emergency care for unbearable pain.  Dr. Mackenzie never recommended the functional

limitations she included in her opinion, and her records are absent of any reports by Plaintiff that

she was unable to perform activities such as sitting, lifting, standing, or walking.  Finally, Dr.

Mackenzie's records do not support limitations due to numbness, tingling, dizziness, or swelling.

Under the applicable standard of review, substantial evidence supports the ALJ's

decision to reject Dr. Mackenzie's opinion about Plaintiff's limitations.  The nature and extent of

the treatment relationship were depreciated by frequent referrals to specialists; the opinion was

not supported by objective medical evidence; the opinion was inconsistent with both Dr.

Mackenzie's own treatment notes and the record as a whole; and Dr. Mackenzie was not a

specialist.

### 2.    Dr. Steiner's Opinion

The Court now turns to the ALJ's decision to give great weight to Dr. Steiner's opinion

that Plaintiff could perform light work.  When an ALJ rejects the opinion of a treating source, he

may credit the opinion of a non-examining source instead.  See Hacker v. Barnhart, 459 F.3d

934, 936 (8th Cir. 2006) (where the ALJ discredited the opinions of treating physicians, finding

that the ALJ was correct in crediting the opinion of the medical expert, coincidentally, Dr.

Steiner, because he "was highly qualified and because his opinion was consistent with the

overall evidence and with the testimony of state agency medical consultants.").

The Court finds that the ALJ's decision to give great weight to Dr. Steiner's opinion is

supported by substantial evidence.  The ALJ explicitly found that Dr. Steiner was a board-certified specialist in physical medicine and rehabilitation and was familiar with the disability requirements at issue, thus implying that Dr. Steiner was highly qualified.  The ALJ recounted Dr. Steiner's findings that Plaintiff suffered from an adjustment disorder with mild depression, obesity, mild obstructive sleep apnea, fibromyalgia, pain, and irritable bowel syndrome with fecal incontinence.  Dr. Steiner opined that these conditions would cause Plaintiff to be restricted in lifting and standing, which would limit her to a range of light work.  Dr. Steiner also remarked that Plaintiff would require some allowance for access to a bathroom but that her incontinence varied in frequency and intensity.

As a testifying medical expert, Dr. Steiner had no treatment relationship with Plaintiff, but that did not preclude the ALJ from giving his opinion great weight.  The question is whether Dr. Steiner's opinion was supported by objective medical evidence and was consistent with the record as a whole, and the Court finds that it was.  Multiple records indicate that Plaintiff's pain, sleeping problems, and incontinence varied in intensity and frequency.  Physical examinations performed by Plaintiff's treating physicians did not reveal a loss of strength, decreased range of motion, or inabilities to walk, sit, or lift.  Numerous records reflect no acute distress or pain-indicating behaviors, and that Plaintiff's symptoms were improved by therapy and adjustments in medication.  Although a few treatment notes indicate that Plaintiff appeared tired, most reports describe her as alert and oriented.  Specifically with respect to Plaintiff's incontinence, there is no objective medical evidence supporting a need to use the bathroom six times per day, for fifteen to twenty minutes at a time.  On the other hand, the medical record often reflects a weekly episode of incontinence or only occasional flare-ups not mentioned in later visits.

27

The ALJ's decision to reject the opinion of Dr. Mackenzie in favor of Dr. Steiner's opinion could be considered a close call.  However, a court may "disturb the ALJ's decision only if it falls outside the available 'zone of choice.'"  Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006) (quoting Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994)).  The decision may not be reversed merely because the court could have reached a different conclusion in the first instance.  Id. (citing Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001)).  The Court finds that the ALJ's decision was within the zone of choices created by substantial evidence in the record as a whole.

### B.      Plaintiff's Mental Impairments

Plaintiff first asserts that the ALJ failed to include depression and anxiety as severe impairments.  Plaintiff bases this argument on Dr. Mackenzie's opinion that Plaintiff is seriously limited in three sub-categories of work-related activities.  Plaintiff also asserts that the Appeals Council should have obtained another expert opinion on her psychological condition.[1]

### 1.      Dr. Mackenzie's Opinion

Plaintiff concedes that Dr. Mackenzie did not treat her for depression.  Nevertheless, Plaintiff faults the ALJ for not adopting Dr. Mackenzie's opinion expressed on a Medical Assessment of Ability To Do Work-Related Activities (Mental) form.

The record indicates that Plaintiff has a long history of depression and anxiety.  Even so,

---

[1] Plaintiff does not argue that the additional evidence submitted to the Appeals Council should affect the determination of whether substantial evidence supports the ALJ's decision, which is the typical argument made when new evidence is submitted after an ALJ's decision. Even if she had, however, the Court would find the argument without merit because any increase in Plaintiff's depression or anxiety was "reactive" to the adverse disability determination (Admin. R. at 441) and therefore relatively temporary.

as the ALJ noted, Plaintiff did not list depression or anxiety as a disabling condition in her application for disability benefits. A claimant's failure to list depression or anxiety in her application is a significant factor in determining whether such an impairment is severe. See Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001).

In addition, there is substantial evidence in the record from other medical sources, who actually treated Plaintiff for depression and anxiety, that her symptoms were generally mild and well-managed by medication. Dr. Coen evaluated Plaintiff in March 2004, at the request of Dr. Fox, and opined that Plaintiff's insight, judgment, attention, concentration, memory, and orientation were adequate. Ms. Baker, Plaintiff's psychologist, stated only that Plaintiff was depressed and was taking medication for that condition. In October 2004, Dr. Bouen noted that Plaintiff's symptoms had improved from moderate to mild. Dr. Wiger, a consultative examiner, remarked that Plaintiff did not describe major depression or exhibit symptoms indicating an anxiety disorder. He found Plaintiff's attention, concentration, memory, and judgment to be good, and concluded that she could understand directions, carry out mental tasks with reasonable persistence and pace, respond appropriately to coworkers, and handle the mental stressors of the workplace. These medical records do not support a finding that Plaintiff's anxiety or depression were severe impairments.

Even assuming that Dr. Mackenzie treated Plaintiff's depression and that her opinion was not inconsistent with substantial evidence in the record, Dr. Mackenzie's assessment of Plaintiff's mental functioning is consistent with only mild depression. Dr. Mackenzie opined that Plaintiff had a good or very good ability to function in six of eight areas related to making occupational adjustments, and a fair ability in only two areas—dealing with the public and

29

dealing with work stress.  The term "fair," as used in the work-related activities form, means that

the person's ability to function is seriously limited, but not precluded.  See 20 C.F.R. pt. 404,

subpt. P, app. 1, § 12.00(c).  A few pages later in the same evaluation, Dr. Mackenzie wrote that

Plaintiff would be able to perform low stress jobs.  Dr. Mackenzie rated Plaintiff as good or very

good in all areas of making performance adjustments.  She also rated Plaintiff as good or very

good in three of four areas pertaining to making personal-social adjustments; the only fair rating

in this category was for an ability to relate predictably in social situations.  The fact that Dr.

Mackenzie rated Plaintiff's abilities as fair in three distinct sub-categories does not mandate the

conclusion that she is more than mildly limited by her mental impairments, especially when

viewed in light of Dr. Mackenzie's ratings of good or very good in twelve other sub-categories.

### 2.    Additional Expert Opinion Evidence

Plaintiff faults the Appeals Council for not obtaining another expert opinion on her

psychological condition after she submitted additional medical records.  Plaintiff relies on Social

Security Ruling (SSR) 96-6p, which states:

> [L]ongstanding policy requires that the judgment of a physician (or psychologist)
> designated by the Commissioner on the issue of equivalence on the evidence
> before the administrative law judge or the Appeals Council must be received into
> the record as expert opinion evidence and given appropriate weight.
> . . .
> [T]he Appeals Council must obtain an updated medical opinion from a medical
> expert . . . [w]hen additional medical evidence is received that in the opinion
> of . . . the Appeals Council may change the State agency medical or psychological
> consultant's finding that the impairment(s) is not equivalent in severity to any
> impairment in the Listing of Impairments.

Plaintiff argues that the submission of additional evidence to the Appeals Council required a new

opinion from a medical expert on whether Plaintiff met or equaled a listed mental impairment.

Plaintiff's reliance on SSR 96-6p is misplaced.  SSR 96-6p requires the Appeals Council

to obtain an updated medical opinion from a medical expert only when the additional medical evidence, in the opinion of the Appeals Council, would change a previous expert opinion that an impairment is not equivalent to a listing.  Here, the Appeals Council was not of the opinion that the additional medical evidence would change the previous expert opinion.  To the contrary, the Appeals Council found that the additional evidence submitted by Plaintiff did not provide a basis for changing the ALJ's decision.  Thus, the Appeals Council was not obligated to obtain a new medical opinion.

### C.     The ALJ's Assessment of Plaintiff's Credibility

Plaintiff contends that the ALJ did not properly assess her credibility in accordance with Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  Plaintiff did not identify which factors the ALJ supposedly neglected to address, nor did she pinpoint which subjective complaint, pain or incontinence, was wrongfully assessed.

In the Eighth Circuit, credibility determinations are governed by factors enunciated in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  In assessing subjective complaints, an ALJ must examine several factors: "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996) (citing Polaski, 739 F.2d at 1322).  Other relevant factors are the claimant's work history and the objective medical evidence.  Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999) (citing Polaski, 739 F.2d at 1322).  "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every Polaski factor relates to the claimant's credibility."  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007) (citing Tucker v.

Barnhart, 363 F.3d 781, 783 (8th Cir. 2004)).  "The ALJ may discount subjective complaints of

pain if they are inconsistent with the evidence as a whole."  Id. (citing Polaski, 739 F.2d at

1322).

The Court begins by noting that the ALJ only found Plaintiff's subjective complaints to

be "less than credible."  (Admin. R. at 25.)  He did not discount them entirely.  Indeed, the ALJ

considered Plaintiff's "credible degree of pain, possible medication side-effects and/or her

adjustment disorder or depression" in limiting her to unskilled work.  (Id. at 26.)  In addition, to

the extent the ALJ discredited Plaintiff's subjective complaints, it is clear from the decision that

he considered all of the Polaski factors even though he did not systematically address them.

With regard to Plaintiff's daily activities, the ALJ noted that Plaintiff was somewhat

limited physically, but that she performed light household tasks, cooked, used the computer,

watched television, shopped, scrapbooked, exercised at home, and went to the pool.  The extent

of Plaintiff's daily activities is inconsistent with the amount of pain claimed by Plaintiff.  See

Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

As to the dosage, effectiveness, and side effects of medication, the ALJ expressly

accounted for this factor in limiting Plaintiff to unskilled work.  In addition, the treatment notes

of Plaintiff's doctors reflect that Plaintiff's medications were generally effective in improving

her symptoms, as was the pool therapy.  The ALJ considered that changes in medication

occasionally caused a flare-up of Plaintiff's irritable bowel symptoms, but he also observed that

it was usually resolved by the next appointment.

Concerning functional restrictions, the ALJ properly rejected Dr. Mackenzie's

unsupported and contradictory opinion, as discussed above.  No other doctor, not even Dr.

Parker at the Colon and Rectal Clinic, imposed restrictions on Plaintiff for her bowel symptoms or incontinence.  No other doctor imposed functional restrictions on Plaintiff for her pain.

As to the objective medical evidence, the ALJ identified several inconsistencies in Plaintiff's reported severity of pain.  The ALJ acknowledged that, at times, Plaintiff reported "constant and very significant pain . . . even unbearable pain."  (Admin. R. at 26.)  However, most examinations revealed no acute distress and mere tenderness to palpation, and Plaintiff never sought emergency care for unbearable pain.  Many reports of examinations lacked any observed pain or limitations at all.  Virtually no report reflected any loss of strength, decreased range of motion, or inability to sit, walk, stoop, squat, or lift, which would be expected with constant and significant pain.  The ALJ cited Dr. Hanson's opinion that Plaintiff should be able to control her back pain with exercise, which would also help her incontinence.  As discussed in detail above, the ALJ correctly discounted Dr. Mackenzie's unsupported and contradictory opinion on Plaintiff's functional restrictions.

The ALJ also correctly noted that the objective medical evidence did not contain findings of a bowel obstruction or weight loss ordinarily associated with severe irritable bowel syndrome. There is similarly no evidence of dehydration, malnutrition, fever, blood in the stool, abdominal pain, or other side effects which might result from frequent diarrhea.  Although Plaintiff claimed to experience incontinence up to six times a day, the objective medical evidence does not support this claim.  The record primarily demonstrates that Plaintiff's incontinence varied greatly in frequency, was usually exacerbated by changes in medication, and often resolved by adjustments in medication or a change in diet.  Many records, including numerous records from Dr. Mackenzie, make no mention of irritable bowel symptoms or incontinence at all.  The record

33

never indicated that Plaintiff regularly had to use the bathroom six to ten times a day for fifteen to twenty minutes at a time.  Notwithstanding the lack of objective evidence supporting Plaintiff's claimed degree of irritable bowel symptoms and incontinence, the ALJ did account for recent evidence that indicated "some degree of recurrence or exacerbation of the claimant's irritable bowel syndrome."  (Id. at 30.)

Pertaining to the objective medical evidence factor, it is noteworthy that Plaintiff failed to pursue certain treatments recommended by her doctors, which also indicates that Plaintiff's subjective complaints were not as severe as she claimed.  See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).  For example, Plaintiff refused to undergo trigger point injections, which both Dr. Nelson and Dr. Mackenzie suggested, to treat her pain.  In addition, there is no evidence that Plaintiff followed through with Dr. Parker's recommendation that she consider an artificial bowel sphincter or a colostomy.  Similarly, as the ALJ remarked, there is no evidence that any of Plaintiff's physicians placed her on a specific diet to help with her irritable bowel symptoms, other than to suggest that she increase her fiber intake and read the South Beach Diet book.  The ALJ also noted that Plaintiff's doctors repeatedly stated that Plaintiff needed to increase her exercise.

Finally, the ALJ acknowledged that Plaintiff had a good work record, but that the record also showed a lack of motivation by Plaintiff to return to even part-time work.  For example, after Dr. Rayadurg refused to extend Plaintiff's work leave, she changed doctors.  Plaintiff also expressed frustration with Dr. Hanson's opinion that her conditions were treatable and controllable.

In conclusion, the Court finds that the ALJ's credibility assessment is supported by

substantial evidence.  The ALJ correctly assessed Plaintiff's subjective complaints in accordance

with <u>Polaski</u> and found her complaints of pain and irritable bowel symptoms only partially

credible.

**D.    The Hypothetical Question Posed to the Vocational Expert**

Plaintiff faults the ALJ for not including all of the limitations suggested by Dr.

Mackenzie in the hypothetical question posed to the vocational expert, Mr. Mastbaum.

However, the Court has found that the ALJ properly disregarded Dr. Mackenzie's opinion, and

thus, he was not required to include those limitations in the hypothetical question.

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 14) be **DENIED**; and

2.    Defendant's Motion for Summary Judgment (Doc. No. 17) be **GRANTED**.

Dated: January 30, 2008

s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing
with the Clerk of Court, and serving all parties by  **February 14, 2008**, a writing which
specifically identifies those portions of this Report to which objections are made and the basis of
those objections.  Failure to comply with this procedure may operate as a forfeiture of the
objecting party's right to seek review in the Court of Appeals.  A party may respond to the
objecting party's brief within ten days after service thereof.  A judge shall make a de novo
determination of those portions to which objection is made.  This Report and Recommendation
does not constitute an order or judgment of the District Court, and it is therefore not appealable
to the Court of Appeals.